SHERMAN LAWRENCE v. THE STATE.

*No. 1382.   Decided June 3rd, 1896.*

### 1.  Murder—Express Malice—Intent.

To constitute murder, it is not necessary that any length of time intervene between the formation of the intent to kill and the killing, and no length of time is required to form the intent to kill upon express malice. The very fact, that the killing was without cause, indicates that the motive or intent was in a heart devoid of social duty, and fatally bent on mischief.

### 2.  Same—Charge—Manslaughter.

A charge upon manslaughter, which authorizes the jury to consider all the facts and circumstances in the case in determining the provocation, if any, and if such facts and circumstances were sufficient to excite in defendant's mind a degree of passion of a character to render him for the time incapable of cool reflection, and that he killed deceased under such circumstances, to find him guilty of manslaughter, was sufficient without stating the particular facts upon which it was predicated.

### 3.  New Trial—Controverting Affidavits.

Where the State had filed controverting affidavits to defendant's motion for new trial, based upon newly discovered evidence, if defendant desired time to answer said affidavits, he should have craved the same before going into the argument of the motion for new trial.

### 4.  New Trial—Newly Discovered Evidence.

A motion for new trial, based upon newly discovered evidence, is properly refused when said newly discovered evidence is not probably true.

### 5.  Same—Self-defense.

On a trial for murder, where it appeared that defendant was the aggressor, that he started for deceased, that deceased threw his right hand up to his breast when defendant fired and killed him. Held: Self-defense was not in the case.

APPEAL from the Criminal District Court of Dallas. Tried below before Hon. CHARLES F. CLINT.

This appeal is from a conviction for murder in the first degree, the punishment being assessed at a life term of imprisonment in the penitentiary.

The material facts, attendant upon the killing, are shown by the testimony of the witness, W. D. Black, as follows: "I remember well the

night that Mason Miller was shot and killed. It was, I think, September 23rd, 1893, and in Dallas County, Texas. On that evening, I took supper with him at his brother's, John Miller. Mason Miller, the deceased, was running a team at the time, and I had known him since February previous. He boarded and roomed at the home of his brother, John. After supper, Mason Miller and I went to Mrs. Neachman's, who Mason went to see about purchasing a wagon from her. · When we got to Mrs. Neachman's house, I stopped on the outside, and he went inside; and after awhile we started on down to go to a Mr. Houseman, to see him on business about some wood, and Mr. Houseman's house was right near Pabst brewery. In order to go from Mrs. Neachman's to Houseman's, we took a trail across a vacant lot. Miller was walking in front of me, four or five feet, and, while traveling in the trail, we heard some voices to our right, and discovered them to be four or five people, which we took to be negroes; they were going, seemingly, in the direction we had come, and were in a path or trail running parallel with ours, and ten or twelve feet apart, with weeds a head high, particularly between us. These weeds were of this height all along in the rear and in front of us, between the paths at a distance of an hundred feet either way. · I heard a negro man's voice, and then I heard Miller mumble something, but couldn't make out what either said. It was dark, and the thought struck me that they knew one another. The weeds were about shoulder high, enough for us to see the tops of their heads, and they ours. I didn't know but what the man, who was talking with us knew Miller, and was friendly with him, but I soon found out better, because without the least warning that he was coming through the weeds, or was approaching Miller at all, a negro man sprang into the path at the edge of the weeds by Miller, and threw his pistol right in Miller's face, and said to him, 'You move, you white livered son-of-a-bitch, and I will kill you;' and, when the pistol was being held in Miller's face that way, and after the remark made by the negro man, Miller said, 'You have got me, ain't you?' The negro then fired, and Miller fell instantly. The negro then started off, and said, 'That is my record.' Miller was shot right in the middle of the forehead, and he died without a struggle. He had nothing in his hands, and made no attempt whatever to do anything towards the negro, or harm him. I was looking at them closely. I didn't hear him coming through the weeds towards us. The first thing I heard or saw of him after hearing the voice in the parallel path was, he was right on to Miller, with the pistol in his face, as I have said. After he shot Miller, as I have described, he started off, saying, 'This is my record.' He went off rather deliberately in the direction of the brewery. Miller never moved either backward or forward, but was standing when he was killed on the place where he had stopped when he seemed to be replying to the voice in the parallel path. At the point where Miller was shot, I would say, that he had passed the man to whom he seemed to be replying to. I was within ten feet of Mason Miller in the path when he was shot; he fell on his back in the path; the face was badly powder

burnt from the pistol. He was killed in Dallas County, Texas, and died from a pistol wound inflicted by a negro man. The negro had his gun in his hand when I first saw him facing Miller." Cross-examination: "I had not been with Mason Miller all day. He didn't have on a coat when he was killed. He had on a vest, and it was buttoned all the way down and close up under his neck. I saw a pistol taken from his inside vest pocket after he was killed. I never knew him until the February preceding his death. When I met him first, he told me that he had just gotten back from the penitentiary. The negro, whose voice I heard, seemed like he said, 'This is Mr. Somebody,' I didn't get the name; then, the negro said something else, and Miller said something that I did not understand; but, I thought that they knew each other until the negro pulled the gun. There was another negro with the fellow who did the shooting—at least, he was over in the trail along with some women. I never saw any baby or child. I have been arrested several times. I was in jail once for counterfeiting; don't know how many times I have been arrested; don't know how many drinks I have taken. I have been arrested for an aggravated assault and carrying knucks, and for the disturbance of the peace. I have been convicted a time or two for fighting. I believe I heard Miller say, before he was shot, and when answering the voices in the other path, 'What do you negroes want?' I don't know who spoke first. I never said anything; it was such a short time between the talk and the shooting. If there was any child along with that crowd, it was so small I didn't see it." Redirect examination: "The pistol that Miller had on him was in his inside vest pocket, and the vest was all buttoned up closely. I saw his hands plainly when the negro jumped into the path and pointed the pistol right down in his face. Miller had nothing in his hands, and didn't attempt to use them. All he done and said was in reply to the language addressed to him, 'You move, you white livered son-of-a-bitch, and I will kill you,' was, 'You have got me, ain't you?' Yes, I was arrested on the charge of counterfeiting, but they turned me loose immediately, as I was not the man they wanted. I have paid a fine or two, but nothing worse."

Cabell, the sheriff, Wood, Ramsey and W. H. Sanderson, testified, "That they were at deceased's body promptly; that his vest was buttoned up, and that upon unbuttoning it they found an old pistol in the bottom of the inside pocket."

Frank Murray, for the defense, testified about going along the parallel path in company with Katie and Mattie Murray. "That defendant and the parties in the other path got into a conversation which he did not hear until he heard defendant say, 'It's a d—d lie, you wont do what you say you will do.'" He says: "I started back and I saw Sherman step backwards, and I saw the white man, who was shot, put his hand up to his breast, and, as he did so, Sherman shot him. I don't know how Sherman, the defendant, was carrying the baby, but he was saying to her, 'Have all the fun you want, but don't start nothing.'" Cross-examination: "As soon as Sherman said, 'It is a damned lie, you won't do what you

say you will do,' he put the child down, and he started like he was going towards a man that was in the other path, and I saw that man, who was afterwards the deceased, throw his right hand up to his breast, and Sherman started back and fired and killed him. Sherman was off some ten or twelve feet from him when he shot, and I was about twenty-five feet from Sherman and ten or fifteen feet from the women." The witness had previously stated, that the weeds between the two paths were as high as a head. He was then asked how was it he could see the deceased throw his right hand to his breast when the weeds were so high? Hê replied, after a moment's thought, "Right along dar the weeds was kinder low like." "I didn't see the deceased move toward Sherman." The witness was asked if he was not present that night, after the shooting, at the body, and also at the city hall, and heard Sheriff Cabell asking those present (witness among them) if they knew who it was that did the shooting, and made no reply. To this question, the witness answered, "No." He was then asked, if it was not after that time after the witness found out that Sheriff Cabell had learned from Katie Murray, wife of Randolph Murray, who it was that did the shooting, before he (witness) would tell who it was that did the shooting? To this question, witness answered, "No." This witness, proceeding with his testimony, said: "When I saw Sherman was going to shoot, I tried to get to him and stop him, and I started towards Sherman and told him not to shoot, but before I got to him he shot." Witness was then asked, if he didn't have a talk with Sheriff Cabell after the sheriff had learned that the defendant was the man that did the shooting; and, that if, in the conversation, he did not tell Sheriff Cabell that, all he knew about it was, that they were going along the road and he heard voices, and he saw Sherman was about to shoot a man, and he tried to get to him to stop him, and told Sherman, to to stop and not shoot; but, he (witness) was too late. To this question, the witness answered, "Yes." He was then asked, if he told Sheriff Cabell or any one else about the deceased putting his hand to his breast before he shot? and, to this question witness answered: "I didn't say I told him," and remarked that he was saving that for the grand jury. He was then asked, you told all but that did you, and was saving that one fact for the grand jury? and he answered, "Yes." He was then asked, why didn't you tell that also? He answered, "I didn't think I had to tell it all until I was before the grand jury. I thought when I told them as much as I did, I would keep the rest until I got before the grand jury. I didn't decline to tell the sheriff who it was that killed the man. I admit that I heard the sheriff asking who it was that killed Mason Miller?"

The matters pertaining to defendant's amended motion for new trial, and the affidavits as to the newly discovered evidence, are sufficiently stated in the opinion.

*Seay & Seay*, for appellant, filed an able and interesting brief, in which they insisted, that there was no evidence of express malice, and consequently no murder in the first degree in the case; that the charge

of the court upon manslaughter was defective and erroneous; and, that the court should have granted defendant's motion for new trial for the newly discovered evidence.

[After the opinion below, affirming the judgment, was handed down, Robt. B. Seay, for appellant, filed a motion for rehearing, which was overruled on the 11th of November, 1896, without a written opinion.— Reporter.]

*Mann Trice*, Assistant Attorney-General, for the State.

[No brief found with the record.—Reporter.]

DAVIDSON, JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at a life term in the penitentiary, and he prosecutes this appeal. Appellant contends that the charge of the court ought not to · have submitted murder in the first degree at all, as all of the evidence showed that the killing was upon a sudden impulse produced by some cause unknown. It is true that the testimony showed a killing based upon a very slight pretext. The very fact, however, that the evidence shows that there was occasion for the killing, indicates that the killing was malicious. It is not necessary, as has been repeatedly held, that any length of time intervene between the formation of the intent to kill and the killing, and no length of time is required to form the intent to kill upon express malice. The very fact that the killing was done without cause, indicates that the motive or intent was in a heart devoid of social duty, and one fatally bent on mischief. Appellant claims that the charge of the court on manslaughter did not state the particular facts upon which such a charge was predicated. The charge was a comprehensive one upon this subject, and did not restrict the jury to the statutory causes, but authorized them, in determining the adequacy of the provocation, if any, to consider all the facts and circumstances in evidence in the case, and if they found said facts and circumstances were sufficient to excite passion in the defendant's mind of such a character as to render him for the time being incapable of cool reflection, and that he killed the deceased under such circumstances, to find him guilty of manslaughter. We think this a sufficient charge. Appellant complains that he should have been allowed further time to answer the controverting affidavits filed by the State to his application for a new trial, on the ground of newly-discovered evidence. From the court's explanation to appellant's bill, it appears that the defendant did not ask further time to file counter affidavits until he had gone into a discussion of the motion. He should have craved further time before the argument of said motion. Appellant filed a motion for a new trial, because of the newly-discovered evidence of Mrs. K. Nitzschmann, Mary Ventura and D. B. Frank. The State proved by Cabell and others, that they got to the scene of the homicide soon after it occurred, and the body was apparently undisturbed, and that the defendant's vest was buttoned close up all the way; that on unbuttoning the same, on the inside vest pocket,

36th Tex. Crim. Rep.—12.

a small pistol was found. The affidavit of D. B. Frank states that he thinks he reached the body of the deceased first; that he struck a match, and held it to his face; and that he noticed his vest was unbuttoned; and that he had not mentioned the matter until after the trial, when he told the appellant's attorney, R. D. Seay. On the trial of the case, the State proved by the witness, Black, (who was with the deceased at the time he was shot) that the deceased's vest was buttoned all of the way down, and close up under his neck; that he saw the pistol taken from his inside vest pocket, after he was killed; and that Sheriff Cabell arrived about twenty minutes after he was killed, and found the vest in that same condition. So that the witness, Frank, seems to have mysteriously found the body, and said nothing about the fact until after the trial; and if it is true, as he states, that the vest was unbuttoned, he must have seen it after he was killed, and after some one had unbuttoned the deceased's vest. If, however, Cabell and Black were both mistaken about his vest being buttoned up, we cannot regard his testimony as material. The homicide was committed at night. The witnesses say that it was a dark night. The parties, the deceased, who was with one Black, were walking in a path parallel with the appellant and some three or four others. There were high weeds between the two paths. None of the witnesses pretend to have been able to see anything that either of the parties did immediately prior to the killing, except one witness, Murray, who testified for the appellant that the deceased, as appellant ran across to the path where he was, threw his hand to his bosom. He could have done this as well with his vest buttoned as unbuttoned, and the demonstration would serve the same purpose in either event; so we cannot regard his testimony as material, even if it were not confronted in such manner as to render it altogether improbable. The affidavits of Mrs. Nitzschmann and Mary Ventura show that they lived not far from where the homicide was committed; that on the night of the homicide, and shortly before it occurred, the deceased and one William Black came to the house where said parties lived; that the deceased came for the purpose of buying a wagon; that while there, the deceased, Mason Miller, drew a pistol from his pocket, and began waving it about, and stated, "I've got this (meaning the pistol), and I am not afraid of anybody;" that, on request, deceased put up the pistol, and they left, going towards one Houseman's place, about 400 yards distant. After a few minutes, they heard a pistol fired in the direction they had gone. Mrs. Nitzschmann immediately went down there, and found one hand of the deceased down by his side, and there was a large pistol by it, the same pistol that she had seen him with at her house a short time before. The way she came to see it, she was examining the body and stepped on it. Miller (deceased) was then dead. It appears that this witness and Mary Ventura were summoned as witnesses by the State, and were present at the trial, but were not examined. R. B. Seay, attorney for appellant, and appellant, both made affidavits that they knew nothing of their testimony, and had no reason to suspect that they knew the facts to which they swore in their affidavits.

The State controverted these affidavits by Ben Cabell, the sheriff, and R. P. Sanderson, a mounted policeman; and they both state in their affidavits that, immediately after going to the body of the deceased, they went to the house where Mrs. Nitzschmann and Mary Ventura lived, and talked with said witnesses, and they informed them about the killing of Miller, and that neither of said witnesses knew that he had been killed, and they so stated, and furthermore stated that it had been but a short time since he left their house, and that while there he behaved very nicely, and were surprised to hear that he had been killed. In the face of the controverting affidavits, in our opinion, the court correctly held that the newly-discovered evidence was not probably true. The court gave a charge on self-defense, though this is scarcely raised by the testimony. If the deceased had a pistol, the appellant could not have seen his pistol in the path in which he was traveling, and he could only have seen it when he sprang across the path, and confronted him with his own pistol. The parties evidently did not know each other. The witnesses did not seem to apprehend anything until the defendant jumped from the path in which he was traveling, over the weeds into the path where Miller was, and confronted him saying: "You move—you white-livered son-of-a-bitch, and I'll kill you." He held the pistol in Miller's face. Miller said: "You have got me, ain't you?" The defendant then fired, and the appellant immediately started off, saying: "That is my record." This is the testimony of the witness, Black, who was in the path with the deceased at the time of the killing. The witness, Frank Murray, who testified for the appellant, stated that, as he walked along, he heard a conversation start up between the two men in the other path and the appellant, who was with his party. The defendant made the remark: "It is a damned lie; you will not do what you say you will do." The defendant then started for the man in the other path. Deceased threw his right hand up to his breast, and appellant fired, and killed him. This latter is the most favorable testimony for the appellant. We do not see how it can be re-enforced by the newly-discovered evidence, so as to make for the appellant a case of self-defense. By his own testimony, the appellant was the aggressor; and if the deceased had a pistol, and was about to draw it as the appellant advanced upon him, it would not make a case of self-defense for the appellant. So, in our opinion, there was no error in the court overruling the motion for a new trial on the ground of newly-discovered evidence. The judgment is affirmed.

*Affirmed.*

HURT, Presiding Judge, absent.